[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs bring this declaratory judgment action seeking various relief from the practice in the New Haven Fire Department known as underfilling. The plaintiffs Sheryl Broadnax, John R. Brantley and Christopher Texiera are Lieutenants in the New Haven Fire Department CT Page 2095 (department). The plaintiff Ronald Benson is a Firefighter with the department; the plaintiff Clifton Pettaway was a Firefighter with the department who was, during the pendency of this litigation, terminated for reasons apparently unrelated to this litigation; the plaintiff Danny Dolphin is a Firefighter/EMT with the department. Neither Dolphin nor Pettaway have ever passed the Lieutenant eligibility exam. The defendants are the Fire Department, the City of New Haven, the Board of Fire Commissioners of the City of New Haven and the Civil Service Commission of the City of New Haven.
Underfilling[1] in the context of this action occurred when there were several vacancies in the position of Captain in the fire department, and no persons on a valid civil service eligibility list for that rank. Taking the money that had been budgeted for those positions, the Fire Department created ten more Lieutenants than the 48 allotted in the budget by appointing otherwise eligible Firefighters to those positions. These ten additional Lieutenants, by virtue of their rank and time in rank, were eligible to take the Captain's examination. The plaintiffs allege that they have no adequate remedy at law and have suffered irreparable harm since the ten additional Lieutenants, who received their rank of Lieutenant by the practice of underfilling, then took and passed the Captain's exam, and some of them went on to become Captain. Further, the evidence revealed that this form of underfilling has continued to occur since the complained of events, and, that it is considered an acceptable practice by many officials of the City of New Haven. The plaintiffs claim that underfilling violates the rules and regulations of the New Haven Civil Service Commission, the intent, spirit and letter of the Affirmative Action Plan in effect for the city, and the New Haven City Charter.
The trial of this matter was over 8 days; there were 19 witnesses and over 70 exhibits. Post trial briefs were submitted by the parties.
As a preliminary matter, the intervening union and the defendants claim that all necessary individuals have not been provided notice and made a party to this action. Practice Book (Rev. 2000) 17-56 (b) provides in pertinent part: "All persons who have an interest in the subject matter ofthe requested declaratory judgment that is direct, immediate and adverse
to the interest of one or more of the plaintiffs or defendants in the action shall be made parties to the action or shall be given reasonable notice thereof."
"This rule is not merely a procedural regulation. It is in recognition and implementation of the basic principle that due process of law requires that the rights of no man shall be judicially determined without affording him a day in court and an opportunity to be heard." Benz v.CT Page 2096Walker, 154 Conn. 74, 77, 221 A.2d 841 (1966). Pendente lite, the court (Levin, J.), finding that their interests were adverse to the plaintiffs, ordered that the individual ten Firefighters who were underfilled to Lieutenant positions be given notice of the pendency of this action. Now, at trial, the City and the union claim that this is inadequate, and at least one other individual, was required to have notice based upon the complaint of the plaintiffs and the relief sought. The argument of the City and the union is: if the court grants the relief requested by the plaintiffs, that is the voiding of all promotions that have been made by underfilling, this individual is the only one without notice who will be adversely effected, having been promoted by that practice and not yet given formal notice of this lawsuit. At the outset, however, it should be noted that those individuals who were granted notice were identified by the City and the union, not the plaintiffs, as required by the court pursuant to Practice Book § 17-56.[2]
Therefore, any deficiency in notice is the result of their error, not the plaintiffs. Ultimately, this does not matter, inasmuch as the remedy ordered by this court will not result in this individual losing any rights reposed in him by virtue of an underfilling promotion.
The court finds the following facts.
The governing structure of the City of New Haven is the mayor as the executive and the Board of Alderman as the legislative and appropriating body. The City has a charter. From time to time the Board of Aldermen passes ordinances in accordance with the authority granted it by Charter and statute.[3] The Board of Aldermen, as the appropriating body, passes an annual budget, which when passed and signed by the Mayor (as with all enactments of law in the City), has the force of an ordinance within the City. The Budget of the City of New Haven, as enacted by the Board of Aldermen, is approved on a line item basis. In practical terms what this means is that, while the Board does not vote line by line, it approves each line of the Budget in its vote. It has the authority to delete, revise or modify each line item of the budget. Therefore, when the budget at issue for Fiscal Year, 1996-1997, authorized a certain budget for the Department of Fire Services, it did not just authorize a bottom line. The budget was specific as to the number of fire fighting personnel at each level and each officer grade and the funds allotted for those positions at each level and each officer grade.
The Charter (and certain ordinances) makes provisions for the proper procedure for seeking new positions or transfers within a Department. The plaintiffs claim that the process of underfilling described above violate the Charter and ordinances in the City: that there is no Charter or ordinance authority to create permanent new positions without seeking and gaining the approval of the appropriating and legislating body, the Board CT Page 2097 of Aldermen. The plaintiffs are all African-American individuals. They complain that when the City engages in this process of underfilling, it undermines their assurance that all have the benefit of a level playing field for promotion, free from manipulation or subjective decision-making as to issues of promotion. They acknowledge that underfilling promotions have only been accomplished in rank order off the Civil Service exam promotional test lists.
On the face of it, this would assure fairness. The problem is that it puts in the hands of the City the question of when to invoke underfilling, and once underfilling is being done, when to cut it off and stop it. Without underfilling, individuals in the Fire Department know that promotions will only occur when there are vacancies known to all; that is, everyone knows how many positions have been authorized in the budget; everyone know when a vacancy in those specific positions occur; and everyone knows who is then entitled to those vacancies pursuant to the promotion list.[4] Without underfilling, the public and the firefighters will know if the Board of Fire Commissioners or Fire Chief would like additional officers because their request will be public, to the appropriating authority. The public and the Board of Aldermen then will have the ability to comment on this request, and the Board would decide the issue of whether this is an appropriate use of money.
When there is underfilling, the members of the Fire Department do not know when or why someone, next in rank order on the Civil Service list, will be promoted. While the Fire Chiefs (present and past) who testified provided rational and reasoned arguments supporting their underfilling of officers, this does not eliminate the ability for the public, the plaintiffs and other firefighters to speculate as to the motivation for underfilling promotion. This is the manipulation in the process that the plaintiffs fear and complain of. They point out that the Department of Fire Services has a history of challenged hiring and promotional practices that make them suspect and believe that underfilling as practiced in this type is merely an extension of practices that have already been struck down. The irony of the plaintiffs' argument is that several of the plaintiffs have been the beneficiaries of this practice of underfilling and, if they are successful in their challenge here and the relief sought, stand to lose promotions they have gained as well as others.
In 1975, the United States District Court (Zampano, J.) issued a decree ordering the Fire Department to increase its hiring of minority firefighters on a prescribed timeline with a targeted hiring goal.
In 1989, an organization of firefighters known as the New Haven Firebird Society, representing Black and Hispanic firefighters, along CT Page 2098 with seven individual plaintiffs, brought suit challenging a promotional practice widespread in the Fire Department known as stockpiling. Stockpiling was the name given to the practice of promotions made subject to assignment for three promotional lists, one for Lieutenant, one for Captain and one for Battalion Chief, which were due to expire. The Lieutenant and Battalion Chief lists expired on March 31, 1988 and the Captain list expired on December 29, 1989. From the time that those lists expired, to the time of the matters provoking the controversy before the Court, no promotional exams were held for any of these three officer levels.
In the Firebirds case, the challenged practice was to promotions that were made off eligibility lists about to expire although there were no vacancies to allow for the promotions. These promoted individuals are all used to fill subsequent vacancies, until the stockpiled list of promotions is exhausted. At that point, the City would call for new exams for new eligibility lists. The trial court found that the City had been utilizing stockpiling since at least 1968 and perhaps as early as 1947, when the Civil Service was instituted. In the window from 1947 to the trial court's decision in June, 1992 (a 45 year period), 6 Lieutenant and 8 Captain promotional exams had been held; since 1941 there had been 5 Battalion Chief promotional exams. The trial court found promotions subject to stockpiling illegal, when it resulted in promotions actually taking effect after the civil service eligibility list had expired, being in violation of the City Charter and Civil Service Regulations. The trial court, therefore, found that all promotions made pursuant to the practice of stockpiling after the list expiration dates null and void. The list of the individuals that this applied to was provided to the court by the parties, and the court declared the promotion of those individuals null and void. Those individuals were not parties to the action, nor were they individually provided notice of the action. The Firebirds case was returnable to the court on September 19, 1989. It went to judgment on June 9, 1992.[5] An appeal ensued and the trial court decision (Sullivan, Willam J.) was affirmed on August 17, 1993. New Haven FirebirdSociety v. Bd. of Fire Commissioners, 32 Conn. App. 585 (1995).
Thereafter, a Lieutenant promotional exam was held. The eligibility list for that exam expired pursuant to the Charter two years later on January 26, 1998. The City declined to hold any other captain's exam until 1998. In that interim of approximately 11 years, as a result of attrition, the Fire Department was faced with an increasing number of vacancies in its command structure. The Fire Chief utilized a procedure authorized under the
Department's bargaining agreements with the Union known as appointing an "acting" officer. Essentially, when an officer was needed for a CT Page 2099 specific shift, a firefighter of a lesser rank was appointed to act in that position for the shift (and received the pay of the higher level) in accordance with the bargaining agreement.
Martin J. O'Connor, who was the Fire Chief from January, 1996 to January, 1998, requested civil service exams in all officer level positions as soon as he took over as Chief. He was asked to prioritize the request among the various positions, which he did. He did not [wait for their completion in order to make permanent promotions in accordance with the budgeted authorized positions. O'Connor filled the additional Lieutenant slots through the process of underfilling, using Captain and Battalion Chief slotted position funds since he knew he could not promote to these ranks since there was no valid civil service list for Captain or Battalion Chief, and he did not expect one for at least a year. Concerned about the safety of the fireground,[6] O'Connor instituted the utilization of the practice of underfilling to stem the widespread use of acting officers. It was O'Connor's position that the command structure of the Fire Department was seriously lacking. It resulted in what he characterized as an `unsafe fireground.' Although the problem had been addressed through the use of acting officers under an authorized practice for the past 11 years, O'Connor felt that the Fire Department could not wait out the process of Civil Service exams to complete his command structure. Prior to underfilling the positions, O'Connor sought the authority of the Board of Fire Commissioners, which is the body, in accordance with the City Charter, which provided the ultimate hiring and firing decisions on firefighters. The Chairman of the Board of Fire Commissioners inquired of the attorney for the City, Stephen Mednick of corporation counsel's office, as to the legality of this plan of underfilling. The correspondence from Mednick provided assurance that underfilling did not violate the Charter or any City ordinances.
Between 1996 and 1997, 58 permanent Lieutenant positions were filled where budget authority only authorized 48 Lieutenant positions. Thereafter, the Lieutenant civil service list expired. Any new Lieutenants could not be appointed without a new promotional exam. The funds were allocated by the Chief from Battalion Chief and Captain positions which remained vacant. All of the promotions were permanent in nature. After the requisite time in grade, these `underfilled' Lieutenants were eligible to sit for the Captain exam which was held in 1998. Some of these underfilled Lieutenants were subsequently appointed Captain based upon their success on the Captain exam.
 * * *
A declaratory judgment may be maintained "if all of the following conditions have been met: (1) The party seeking the declaratory judgment CT Page 2100 has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; (2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and (3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure." Practice Book § 17-55 (P.B. 1978-1997, Sec. 390.) (Amended June 28, 1999. to take effect Jan. 1, 2000.)
First then, the court must consider whether the plaintiffs have standing in accordance with this standard. The plaintiffs standing to bring this action for declaratory judgment has been continually challenged by the defendants, both in preliminary proceedings as well as at the trial on the merits of this matter. "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . Thus, standing does not hinge on whether the plaintiff will ultimately be entitled to obtain relief on the merits of an action, but on whether he is entitled to seek the relief." (Internal quotation marks omitted.) Lewis v. Swan, 49 Conn. App. 669,675, 716 A.2d 127 (1998); see also Gay Lesbian Law Students Assn. v.Board of Trustees, 236 Conn. 453, 463, 673 A.2d 484 (1996)." Pinchbeckv. Dept. of Public Health, 65 Conn. App. 201, 205, ___ A.2d ___ (2001).
"`It is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment.' Connecticut Assn. of Boards of Education, Inc. v.Shedd, 197 Conn. 554, 558, 499 A.2d 797 (1985)." Connecticut Assn. ofHealth Care Facilities, Inc. v. Worrell, supra, 613. Our rules of practice, mirroring the federal constitutional "case or controversy" requirement; see Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942,20 L.Ed.2d 947 (1968); accordingly provide that no court will render a declaratory judgment on the complaint of a person "unless he has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to his rights or other jural relations which requires settlement between the parties." Practice Book 390(a). ConnecticutBusiness Industry Assn., v. CHHC, 218 Conn. 335, 346-7, 589 A.2d 356
(1991).
One of the plaintiffs is John Brantley, a plaintiff; he scored third on CT Page 2101 the Lieutenant exam held in 1995 and was promoted to Lieutenant in 1996 in a class of 22. At the time, he understood that there were 15 vacant Lieutenant slots. At one point in 1997, he understood there to be 63 Lieutenants as a result of underfilling, while there were only 48 budgeted positions.
At the time the Lieutenants' list expired there were still 58 Lieutenants. Ten underfilled Lieutenants remained in underfilled positions at the time the list expired. It is Brantley's position that these Lieutenants violate the Charter provisions on Civil Service by holding unappropriated positions at the time that the Civil Service list expired. The Lieutenant list was certified on January 26, 1996 and it expired two years later.
Sheryl Broadnax, another plaintiff, passed the Captain eligibility exam in 1998; she was 38th of 45 who passed. Broadnax's line rank remains Lieutenant. She took the exam for Drill Master and tied for first with another individual. In October or November, 1998 she attained the staff rank of Drill Master. She remains interested in attaining the rank of Captain. Her ultimate career goal is to become Chief of the Department. She asserts the underfilled Lieutenants existing on the date that the Lieutenant eligibility list expired were illegal for it violates, in her mind, the principal of the Firebirds decision.
These two plaintiffs have an actual interest in the outcome of these proceedings. The ranks of those who are eligible to take future Captain exams (and those who took the most recent Captain's exam) and thus become eligible for vacancies, will be effected by a determination as to whether underfilling, as it has been described, is declared an illegal or a legitimate promotional and budgetary practice. (Broadnax and Brantley were not the only minority firefighters who were promoted through underfilling. Firefighters Dumas, Texeira, Hewitt, Walker, Rosada and Sanchez were all underfilled from the Lieutenant eligibility list to the position of Lieutenant.)
At the outset it would appear that the plaintiff Clifton Pettaway lacks standing to pursue this action, having been fired from his position as a Firefighter during the pendency of this action, for disciplinary reasons. He has filed a grievance challenging his firing through the union. Therefore, until that dispute is concluded, his termination is not final.[7] If the termination is reversed, he could be reinstated as a Firefighter. Therefore, he retains an interest in this proceeding at the present time. As a Firefighter, he, along with all the other plaintiffs, would have a specific interest in the outcome of this proceeding, since the utilization of underfilling in the department affects the applicant pool for all promotions. CT Page 2102
The City and the union resist the claims of the plaintiffs that the practice of underfilling violates the Charter, ordinances or affirmative action plan of the City. While denying the plaintiffs claim that the practice of underfilling violates the Affirmative Action Plan of the City of New Haven, the defendants also assert that there is no cause of action for an alleged violation of the City's Affirmative Action Plan. The court agrees with the defendants that no such action lies and therefore declines to reach this claim on the merits.[8] Ordinance sec. 2-89 of the City of New Haven created the permanent commission on affirmative action. The responsibilities of the Affirmative Action Commission are ". . . studying, recommending, and pursuing changes to the city ordinances or executive orders in conformity with all Federal, Connecticut State Statutes and the City Charter and with oversight responsibility for implementing the city's affirmative action plan." The Commission must submit an annual report and make formal recommendations to the mayor for corrective action where appropriate.
The chairman of the Affirmative Action Commission, Theodore Brooks, Jr. was concerned that the practice of underfilling at issue here is a promotional system that involves improper discretion as to when to promote, and that it, therefore, circumvented an established system of promotional practices. However, Brooks could not conclude that underfilling had an adverse impact on minorities. He had made no reports about underfilling in his annual reporting to the Mayor on behalf of the Commission.
Where a complaint has been made of a discriminatory practice, the Affirmative Action Commission has the duty to investigate the matter and take certain actions as provided for. In this matter, there was no complaint made to the Affirmative Action Commission of a discriminatory practice. Without this exhaustion of an administrative remedy, the court finds that any cause of action that may lie under the affirmative action plan is lost to these plaintiffs.
As to the balance of the claims of the plaintiffs that underfilling violates the City charter and ordinances, the court finds that "[t]here is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties" in regard to this claim, and, this is the most efficacious forum for the determination of the issues; therefore, the second and third prongs of the test as to whether a declaratory judgment should be granted has been met.[9]
The City Charter, at § 58, describes the appropriating process for the annual fiscal year budget. There is no material dispute between the CT Page 2103 parties as to the meaning and effect of this section. After hearing, "[t]he board of aldermen shall consider and act upon such budget so proposed by the mayor. The board of aldermen shall have the power by amajority vote of the entire board to increase and decrease individuallines of appropriations and to decrease the total appropriation and rate of taxation (emphasis added.).
Once the budget has passed, each department head has a duty under the Charter[10] to report to the controller of the City a work program to show how the budgeted sum allotted to that department is expected to be expended on a quarterly basis. An expenditure over appropriation can result in a personal liability for the over expenditure. This section of the Charter helps to put controls in place to prevent deficit spending by department heads. This Charter section neither directly or inferentially authorized the underfilling budgetary practice of the Fire Department.
The Charter does make provision for transfers during a fiscal year:
"Sec. 60. Transfers during fiscal year.
The board of aldermen may establish by ordinance from time to time an amount of appropriation under the approved budget which the controller with the approval of the mayor shall be authorized to transfer between line items within and department or from one department to another. No such transfer in excess of such authorized amount shall be implemented unless it shall be proposed by the mayor and authorized by the board of aldermen, provided an increase in the total appropriation shall be approved by vote of two-thirds of the entire board of aldermen. Each approved transfer shall be described in the monthly financial report prepared by the mayor pursuant to section 62."
The controversy before the court ultimately focused on the above Charter provisions and two ordinances: Sec. 2-189[11] and 2-190.[12]
Both provisions come under sections of the Charter pertaining to the General Fund of the City of New Haven.
There are several provisions of the City ordinances that have been invoked as authority for the practice of underfilling. Ordinance § 2-189 makes provision for transfers as contemplated by section 60 of the Charter.
"Pursuant to section 60 of the charter, no transfer of appropriation shall be implemented by the controller, nor shall any city agency, official, or employee expend or obligate the monies which are the subject of such transfer, without prior approval by the mayor, nor without prior approval by a transfer committee (consisting of two (2) aldermen not of CT Page 2104 the same party, elected by the board of aldermen and two (2) persons appointed by and serving at the pleasure of the mayor) if the transfer is in the amount of fifteen hundred dollars ($1,500.00) or more and is not subject to the provisions of section 2-190 of the ordinances, nor without prior approval by the board of aldermen if the transfer is subject instead to the provisions of section 2-190 of the ordinances."
This ordinance, read together with section 60 of the Charter, makes clear that where there is a transfer as defined in section 60, it is either subject to approval of the transfer committee (a non 2-190 transfer) or subject to approval of the board of aldermen (a 2-190 transfer). Ordinance sec. 2-190 describes certain circumstances under which prior approval of the board of aldermen is required for transfer of an appropriation. They are where the budgetary transfer would "(a) . . . create a position not included in the budget as adopted or to reclassify a position so included, (b) . . . increase the total annual salary estimate included in an appropriation, whether as a result of a collective bargaining agreement or for any other reason, [or] (c) . . . increase or decrease an appropriation as previously approved by said board by fifteen thousand dollars ($15,000.00) or more."
"It is fundamental that statutory construction requires us to ascertain the intent of the legislature to construe the statute in a manner that effectuates that intent. . . . Starr v. Commissioner of EnvironmentalProtection, 236 Conn. 722, 737, 675 A.2d 430 (1996). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Fleming v. Garnett, 231 Conn. 77, 92,646 A.2d 1308 (1994); State v. Metz, 230 Conn. 400, 409, 645 A.2d 965
(1994). . . . [C]ommon sense must be used in statutory interpretation, and courts will assume that the legislature intended to accomplish a reasonable and rational result. . . . Elliot v. Sears, Roebuck Co.,229 Conn. 500, 515, 642 A.2d 709 (1994); State v. Hinton, 227 Conn. 301,320, 630 A.2d 593 (1993). . . . Cannata v. Dept. of EnvironmentalProtection, 239 Conn. 124, 140-41, 680 A.2d 1329 (1996)." (Citations omitted; internal quotation marks omitted.) Carpenter v. Freedom ofInformation Commission, 59 Conn. App. 20, 24, 755 A.2d 364, cert. denied, 254 Conn. 933, 761 A.2d 752 (2000). Where "the language of the statute is plain and unambiguous, we will not look beyond the words themselves. . . ." Szczapa v. United Parcel Service, Inc.,56 Conn. App. 325, 329, 743 A.2d 622, cert. denied, 252 Conn. 951,748 A.2d 299 (2000). Finally, "we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law. . . . [T]his tenet of statutory construction CT Page 2105 . . . requires us to read statutes together when they relate to the same subject matter. . . ." (Citations omitted; internal quotation marks omitted.) Derwin v. State Employees Retirement Commission, 234 Conn. 411,420, 661 A.2d 1025 (1995). Pantanella v. Enfield Ford, Inc.65 Conn. App. 46, 54-5, ___ A.2d ___ (2001).
Several officials of the City of New Haven testified regarding promotional and budgetary practices and their understanding of the nature of underfilling in relation to Charter and ordinances. Those who testified included Bishop Theodore Brooks, Chairman of the Board of Fire Commissioners of the City of New Haven, David Colesworthy, Fiscal Analyst for the Board of Aldermen, Chief Dennis Daniels, Fire Chief of the Department of Fire Services, Anthony Dawson, Alderman and Vice-Chair of the Finance Committee of the Board of Aldermen, Mary Hadley, Supervisor for Management Services for the City of New Haven Noelya Marciano, Civil Service Examiner for the City of New Haven, Scott Nadel, of the New Haven Police Department, Martin J. O'Connor, former Fire Chief of the City of New Haven, Jorge Perez, President of the Board of Aldermen, Mark Pietrosimone, Controller of the City of New Haven, James Segaloff, Chairman of the Civil Service Commission of the City of New Haven, Phillip Voigt, Alderman and Chairman of the Finance Committee of the Board of Aldermen, and Chief Melvin Wearing, Chief of Police of the City of New Haven. Most of these witnesses testified as both fact witnesses and experts pursuant to a stipulation between the parties.
Expert testimony was also provided by the plaintiffs through Dr. Gerald Jaynes, a professor at Yale University, as an expert in economics and African American Studies. The defendant City of New Haven provided expert testimony through Lawrence Rusconi, managing director of Scott MeGladry, a national public accounting firm, as an expert in public accounting practices and, specifically, those of the City of New Haven.
Many of the City officials were of the opinion that underfilling was not a transfer within the meaning of the Charter and ordinance provisions. For instance Voigt, Chairman of the Finance Committee of the Board of Aldermen, took the position that as long as the overall personnel budget of the Fire Department came in annually within budget, no aldermanic approval was required and the matter was within the department head discretion. At the same time, he acknowledged that the budget as passed, had the force of law and only the Board of Aldermen can amend an ordinance. He did not perceive underfilling as a transfer defined in section 60 of the Charter or an amendment to the budget as passed.
The president of the Board of Aldermen, Jorge Perez was of the opinion that underfilling is permissible without board of aldermen authority if it is a temporary matter to fill a need within the budget. Then with CT Page 2106 reference to Charter provisions, Perez found that the Charter defined a temporary employee as someone employed not in excess of 180 days. He inferred, although the provision does not say it, that this is for nonuniformed City employees. As to uniformed employees he opined underfilling was acceptable without aldermen approval as long as it did not continue over two fiscal years, because then it would be permanent. However, upon consideration of the time the City had been taking in administering promotional exams, as a practical matter, Perez felt that the position could still be temporary even if the underfilling spanned two fiscal years, or more. This position, it is fair to say, is grounded in a view of the practical reality of the situation rather than in any language of the Charter, ordinances or Civil Service regulations[13] of the City.
The current Controller of the City of New Haven Mark Pietrosimone also testified. Pietrosimone has worked for the City since 1980. He, as Controller, is the chief financial officer for the City. Pietrosimone acknowledges that there is a difference between the underfilling challenged here and the other types of underfilling utilized where the budget savings is recognized in the annual budget document as force cuts, compensation cuts and attrition cuts.[14] It is Pietrosimone's position that the Charter is not violated by underfilling because the amount budgeted by the Board of Aldermen, overall, has not been increased and the amount of funds for the position utilized (for example, a vacant captain position) has not been increased over what was appropriated for that position. In his opinion ordinance 2-189 and 2-190 have not been violated because it is his opinion that a new position has not been created and the vacant position's salary estimate has not increased. Overall, Pietrosimone looked at the matter from a bottom line point of view, much like Voigt: the bottom line total salary expenditures for the Fire Department do not exceed the annual budget then this type of underfilling is permissible. He however disagrees with Voigt and opined that section 60 of the Charter regrading transfers has nothing to do with underfilling. From his point of view, simply put, underfilling saves the City money since Lieutenants are paid less than Captains or Battalion Chiefs. He acknowledges though, that if the underfilled Lieutenants are permanent hires, it should go to the Board of Aldermen for approval. Putting aside the City statutory language of what is temporary (an appointment to a position not to exceed 180 days, where there is no valid Civil Service eligibility list for the position), Pietrosimone says it is temporary if the Department Head meant, as a matter of the budget, to make it temporary. From a budgeting perspective, he viewed an underfilled promotion as temporary because he knows it takes two or three years to get a valid promotional exam accomplished. It is the good will of the Mayor's appointees, apparently, that Pietrosimone relies upon. CT Page 2107
The City's expert, Lawrence Rusconi is presently a public accountant with Scott McGladrey; he is a managing director of this national firm. He also had a long history of employment with the City. From 1971 to 1975 he was the budget analyst for the Controller's office; from 1975 to 1980, he was the Treasurer and Deputy Controller of the City and from 1980 through 1983, he was the Controller of the City. Thereafter, he went to work in the private sector. Rusconi was the City's expert witness to support the City's position that the practice of underfilling at issue here does not violate City laws. First, he acknowledged that the approval of the annual budget by the Board of Aldermen is a line item approval of each specific promotion.
In the underfilling at issue here, where the position is permanent but the funding is temporary, it was Rusconi's position that the language of the Charter allowing for temporary positions would only allow the Department to use temporary funding for a period not to exceed 180 days. The court agrees. The continuation of the use of these funds for a position other than what they were appropriated for, without Board of Aldermen approval, for a period over 180 days finds no authority in the City Charter or ordinances. In effect, the City has, for each of these underfills, created a new permanent position without authority of the of the Board of Aldermen. As Rusconi pointed out in his testimony as the City's own expert witness, nothing prevented the Fire Chief, as Department Head, from going to the Board of Aldermen and asking for the new positions during the fiscal year. Rusconi went on to opine that underfilling as it was practiced here is not an appropriate planning or management tool from an accounting perspective. He also noted that without underfilling the unexpended balances in the Captain or Battalion Chief lines would be lapsed balances at the end of the fiscal year, and would be welcomed by the fiscal authority of the City.
Rusconi's public accounting firm also audited the City of New Haven during 1994 to 1997. As auditor he was not informed that this type of underfilling had occurred. As auditor he would have been concerned had he known that underfilling was occurring where the positions created were permanent, not in the budget, and not approved by the appropriating authority. Referencing the Charter again at §§ 174 and 175, Rusconi confirmed that temporary appointments under these sections are only made in anticipation of a Civil Service list being made and posted. Other than that, hires are permanent hires and require authorization of the appropriating authority, which the defendants did not obtain.
David Colesworthy, Fiscal Analyst for the Board of Aldermen expressed his concern with underfilling, as challenged in this lawsuit, as a matter of depriving the Board of Aldermen of the oversight they exercise over the budget. Put in practical terms, Colesworthy explained that if the CT Page 2108 Fire Department is budgeting for a number of higher paid positions and filling them with lower paid positions, then they are holding onto more money that they need and the Aldermen could use the money elsewhere, or, cut taxes. That he points out is a decision for the Board of Aldermen, which it is not being given the opportunity to make.
Colesworthy was the drafter of ordinance 2-190 for the Board of Aldermen, at its direction. Underfilling was not within the contemplation of the Board of Aldermen at the time of the drafting of that legislation.
The utilization of funds appropriated for Captains for additional Lieutenant slots is a transfer as defined by this Charter section. No other interpretation of these provisions can fairly reconcile all of the Charter language and ordinances together. There is no disagreement that the Board of Aldermen did not approve these transfers. Therefore, the court concludes that underfilling, as challenged here, violates the Charter of the City of New Haven.
It is not proper statutory construction to conclude as the defendants urge, that since underfilling is not prohibited in the Charter or ordinances, it is permitted. In fact, underfilling as it occurs, involves the permanent, not temporary, hire of individuals for positions that are not funded from any source authorized by the Board of Aldermen, the appropriating authority. The Fire Chief and Board of Fire Commissioners violated the actual budget, as an ordinance, and ordinance § 2-190 each time this type of underfilling has occurred. The City of New Haven, the Board of Fire Commissioners and Fire Chief have also been in violation of the budget and ordinance § 2-190. The failure to return to the Board of Aldermen for authority for the creation of these new permanent Lieutenant positions was a violation of this ordinance. The working definition of temporary employee, based upon a perception of the need of the Department and the timeline for a Civil Service exam completion finds no basis in the language of any of the City's enabling legislation. Further, this was not a situation of impossibility or emergency. There was time in any of these budget years to go back to the Board of Aldermen for authority; there also remained the temporary remedy of appointing individuals as acting officers. While the Chief found this distasteful, it had been utilized for years and years without any apparent crisis. The Chief argues that there was a crisis in morale. That crisis in morale, however, came from the City refusing to hold promotional exams while it, and the Union which is also a party here, fought a losing battle of litigation over its archaic and illegal promotional practices on the Firebirds lawsuit and its progeny of individual suits in federal court by firefighters. CT Page 2109
The morale problem has become invidious in every respect. There are those who have been promoted that hold their breath concerned over their very real risk of loss of their promotions here. There are the plaintiffs who feel that this improper budgeting practice is used to benefit others than themselves in the hierarchy of promotions. There is plaintiff Benson and the other 11 Firefighters who filed union grievances because underfilling stopped before their names were reached for no purpose that was ascertainable or understandable to them. The problem with underfilling as it has been practiced here is twofold: (1) it spends money on permanent positions that was not appropriated for those positions, thus emasculating the whole appropriation scheme of the City meant to protect and provide representation to taxpayers; and (2) it vitiates the purpose of the Civil Service: to provide a reliable and predictable playing field free from manipulation so that all can feel comfort in the fairness of the hiring and promotional practices of the City.
The plaintiffs claim that allowing the underfilled Lieutenants to sit for the Captain's exam in 1988 violated the Civil Service regulations of the City of New Haven. Initially, the plaintiffs sought an injunction to keep the City from holding that exam. No injunction was issued and the exam was held. An eligibility list was certified of those Lieutenants eligible to be promoted. From that list individuals who were Lieutenants, including underfilled Lieutenants, were promoted to captain. The gravamen of the plaintiffs' complaint, as explicated above, is that these underfilled Lieutenants should not have been eligible to sit for the Captain's exam.
Plaintiffs also claim that the practice of underfilling violates the City of New Haven's Rules and Regulations regarding promotions. A promotion, under the regulations, "means advancing an employee from a position in one class to a position in another class having a higher maximum salary range." The Firefighters who were promoted to Lieutenant by underfilling were promoted within the meeting of the Civil Service Regulations (section 1). They were not temporary promotions (section 4). They constituted permanent employees; however, permanent employees as defined within the Civil Service regulations[15] are in a position approved by the Board of Finance. (By reorganization, the Board of Finance became the Finance Committee, for most purposes, of the Board of Aldermen.) This approval was never granted. Therefore, the individuals in these underfilled positions were not, as Lieutenants, permanent employees within the definition of these regulations. However, the City has regarded and treated them as permanent employees within the Lieutenant position. Most of the underfilled Lieutenants ultimately were slotted into budgeted Lieutenant positions as they became available through attrition. After the requisite time in grade, they were all permitted to CT Page 2110 sit for the Captain's exam held in 1998.
The Lieutenant exam which created a promotional list, was held in November, 1995. The defendants have taken the position that the reason for the backlog was twofold: that they were not going to hold exams while the Firebirds litigation was pending, and, that the entire City was in a backlog of Civil Service exams which resulted in an inability to comply with these regulations and raised the necessity of underfilling. However, there was no such necessity. Acting status under the collective bargaining agreement was available. Further, the failure to have eligibility lists for all officer grades was the result of a City decision not to hold them, and a decision by the appointing authority, the Fire Chief, and Commission not to request them. As of November 8, 1995, the City only had requests for exams in the Fire Department for Deputy Fire Marshall, Fire Communications Supervisor and Fire Inspector II. The City's schedule for exams as of that date, did not include Captain or Battalion Chief. In fact when the Fire Chief asked the City about the status of promotional exams on November 14, 1995, no reference was made to an exam for these two positions. As of June 5, 1995, The Fire Chief had requested a Battalion Chief exam, but the City records on the status of Civil Service Examination of that date shows no request for a Captain's exam. All the sundry other promotional exams of the Fire Department were advanced in 1996. Incompetence, malfeasance or nonfeasance do not constitute a sufficient reason to violate the City Charter or Civil Service regulations regarding permanent employees. The court is left to the inescapable conclusion that the defendants utilized underfilled Lieutenants in lieu of holding an earlier Captain's exam to be taken by then eligible candidates. The underfilled Lieutenants were all able to sit for that exam when they would not have been able to if underfilling had not occurred. Once again the utilization of this process creates a sense of manipulation of the Civil Service regulations to the benefits of a certain few selected by the Fire Chief and Board of Fire Commissioners.
The Civil Service Regulations provide at Rule VI-Method of Filling Vacancies:
"Section 1. Requests. Written requests for eligible lists shall be made to the Civil Service Board by the appointing authority whenever: (a) a vacancy occurs (b) additional employees are required (as approved by the Board of Finance) (c) a vacancy is anticipated. The Civil Service Board shall advise the appointing authority as to the availability of employees for re-employment, requests for transfer, or promotional or eligible lists for the class. Section 2. Types of Appointment. All vacancies in the classified service shall be filled by re-employment, transfer, or from an appropriate promotional or eligible list, if available. When no CT Page 2111 Civil Service list of eligibles exists for a particular class, the Board of Finance may fill arty vacancy in such class by a temporary appointment for not more than ninety (90) working days; and within that period, the Civil Service Board shall hold examinations of candidates for the class. The Board of Finance, when the interests of the City require, shall have authority to extend a temporary appointment for a period of ninety (90) working days but shall not exercise this power more than once in the case of any given appointee."
This Civil Service Regulation language is consistent with the language of the Charter. At various times over the budget years 1996 through 1998 there were underfilled Lieutenants impermissibly filling Captain and Battalion Chief without approval of the Finance Committee itself or the Board of Aldermen. Indeed, the appointing authority, the Board of Fire Commissioners, did not timely request exams for Captain and Battalion Chief vacancies, and the Civil Service Commission did not hold exams as promptly required. Lieutenants remained in underfilled positions as the expiration of the Lieutenant's promotional list on January 26, 1998. The court concludes that the practice of underfilling has been carried on in violation of the Civil Service Rules and Regulations of the City of New Haven.
The defendants argue that since all individuals promoted to underfilled positions will some day be slotted over to properly budgeted positions as others are promoted or retired, they therefore are filling eventual vacancies. This echoes of the reasoning that was rejected in theFirebirds stockpiling case: "The union next reasons that because it can be expected that every position will eventually become vacant, stockpiling is in fact making promotions to fill expected vacancies. We agree that every lieutenant, captain or battalion chief will one day retire, resign, be promoted, die, be removed from his position or otherwise vacate it. Although these officers do not hold their positions for eternity, we do not agree that such an indefinite possibility of a future vacancy is a reasonable interpretation of the New Haven civil service rules. It is axiomatic that courts will not construe statutes, ordinances or regulations to achieve an absurd or irrational result. SeeTurner v. Turner, 219 Conn. 703, 712-13, 595 A.2d 297 (1991).
"It cannot be overemphasized that proper competitive examinations are the cornerstone upon which an effective civil service system is built. Any violation of the law enacted for preserving this system, therefore," "is fatal because it weakens the system of competitive selection which is the basis of civil service legislation." Ziomek v. Bartimole, supra, quoting Civil Service Board v. Warren, 74 Ariz. 88, 91, 244 P.2d 1157
(1952). Strict compliance is necessarily required to uphold the sanctity of the merit system. . . ." (Citations omitted.) Cassella v. CivilCT Page 2112Service Commission, supra, 35. New Haven Firebird Society v. Bd. Of FireComm'rs, 32 Conn. App. 585, 592-593. 630 A.2d 131 (1993).
It has now been over 20 years that the hiring and promotional practices of the City of New Haven Fire Department have been under judicial scrutiny. The City has come up wanting on now a third occasion. At the same time, the Court observes that all promotions at issue here were off a valid Civil Service list and in rank order at the time they were made. Further, the individuals actually assumed and have worked in these positions. The integrity of the Civil Service system requires a remedy that will help to ensure that the laws of the City are followed for all the future promotions in the Fire Department. The court enters the following orders:
In light of the findings that the practice of underfilling, as practiced, is illegal:
1. The defendants are permanently enjoined from engaging in underfilling, as has been defined herein;
2. The court shall appoint a special master to oversee promotions within the Fire Department, the parties shall appear on March 11, 2002 at 9:30 A.M. in courtroom SC for a hearing regarding this impending appointment.
The court will circulate a draft order at that time to counsel, to provide an opportunity to comment on the identity, compensation terms, tenure and authority of the special master to be appointed.
3. Costs are taxed in favor of the plaintiffs upon submission of a bill of costs.
By the Court,
 ___________________ Lynda B. Munro Judge of the Superior Court